❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Mar 25, 2026
s/ OH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>3858 N. 98th Street, Milwaukee, Wisconsin<br>(TARGET LOCATION A-3) as further<br>described in Attachment A-3 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  **26-M-354**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-3

**YOU ARE COMMANDED** to execute this warrant on or before _____4-8-26_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Stephen C. Dries_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*     ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      3-25-26. 10:45 am _____          *Stephen C. Dri* _____
                                                                                              *Judge's signature*

City and state:      Milwaukee, Wisconsin _____          Honorable Stephen C. Dries, U.S. Magistrate Judge
                                                                                                              *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_Executing officer's signature_

_Printed name and title_

<u>**ATTACHMENT A-3**</u>
<u>**PLACE TO BE SEARCHED**</u>

3858 N. 98th Street, Milwaukee, WI **(TARGET LOCATION A-3)** is a split-level, single family, residence with a tan brick front and brown or tan siding on the rear area and a black shingled roof. The number 3858 are affixed to the west face of the residence on the south side of the front door which is white in color. The front door has a glass storm door. There is a wooden privacy fence that extends out from the northwest corner of the residence and surrounds the backyard. The residence has a detached garage with brown siding and a rollup door that faces north into the alley behind the residence. **TARGET LOCATION A-3** is depicted below in Figure 1. This warrant authorizes law enforcement to search all areas of the residence including the detached garage, Antonio WESLEY-Carter's person, if he is present, the three "TARGET VEHICLES" identified in the attached affidavit, if present, and any cellular devices or computers used by or associated with WESLEY-Carter



<u>**Figure 1**</u>

**ATTACHMENT B-3**

**ITEMS TO BE SEIZED**

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, committed by of Antonio WESLEY-CARTER, Djuan WILLIAMS, and/or Scott WILLIAMS, and other known and unknown individuals, between October 1, 2025, to present including:

a. Controlled substances;

b. Evidence of the crimes described above;

c. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

d. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

e. Preparatory steps taken in furtherance of that crime;

f. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

g. Evidence of motive, intent, or knowledge of the crimes described above;

h. Evidence of the location, whereabouts, and patterns of travel of Antonio WESLEY-Carter, Djuan WILLIAMS, and Scott WILLIAMS;

i. Evidence about the appearance, clothing, and identity of Antonio WESLEY-Carter, Djuan WILLIAMS and Scott WILLIAMS;

j. All bank records, checks, credit card bills, account information, and other financial records;

k. Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

l. Lists of drug customers and related identifying information;

m. Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

n. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

o. Indicia of residency;

p. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

q. U.S. Currency;

r. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

s. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachment A-1, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of Antonio WESLEY-CARTER, Djuan WILLIAMS, and/or Scott WILLIAMS to the fingerprint sensor ("Touch ID") and (2) to present the face of Antonio WESLEY-CARTER, Djuan WILLIAMS, and/or Scott WILLIAMS to the facial recognition sensor, such as a camera, ("Face ID") of the device found at **TARGET LOCATION A-3** for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.

**CLERK'S OFFICE**
**A TRUE COPY**
**Mar 25, 2026**
**s/ OH**
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>3858 N. 98th Street, Milwaukee, Wisconsin (TARGET LOCATION A-3) as further described in Attachment A-3 | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  **26-M-354** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-3

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

TYLER OWENBY  Digitally signed by TYLER OWENBY
Date: 2026.03.24 15:43:57 -05'00'

*Applicant's signature*

Tyler Owenby, DEA Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date: **3-25-26**

*Judge's signature*

City and state: Milwaukee, Wisconsin    Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR SEARCH WARRANTS**</u>

I, Tyler Owenby, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AFFIANT BACKGROUND**</u>

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA").  I have been so employed since July 2021 and am currently assigned to the DEA Milwaukee District Office.  As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963.  I have been involved in electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

2.      Prior to my employment with the DEA, I spent the previous five years working as an Analyst assigned to the Columbia Missouri Police Department's Vice Narcotics and Organized Crime Unit.  As part of my duties as an Analyst, I was formally trained and certified in the areas of mobile phone forensics, cell tower and phone toll analysis, and advanced open source intelligence gathering techniques.

3.      I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses.  More specifically, my training and experience includes the following:

1

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

d. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

e. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

f. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses.

2

This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that the crimes of distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21 United States Code Sections 841(a)(1), 846, and 843(b), have been committed by Antonio WESLEY-Carter (DOB:XX/XX/1985), Scott M. WILLIAMS (DOB:XX/XX/1959), Djuan L. WILLIAMS (DOB: XX/XX/1979), and other known and unknown individuals.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe search the locations and/or vehicles described in Attachments A-1 through A-6 for evidence of these crimes, as described in Attachments B-1 through B-6.

**PROPERTIES AND PERSONS TO BE SEARCHED**

7.     This affidavit is submitted in support of applications for search warrants to seek evidence of illegal possession and distribution of controlled substances, and conspiracy to do the same, in violation of Title 21, United States Code, Section 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843 (collectively the "Target Offenses") for the following locations (collectively "**TARGET LOCATIONS**") associated with Antonio WESLEY-Carter and other members of the drug trafficking organization (DTO), who have committed, are committing, and will continue to commit the above-listed offenses:

a. **Attachment A-1:**  2511 W. Auer Ave, Milwaukee, WI **(TARGET LOCATION A-1)** is a two-story, single family residence with tan siding,

3

white trim, and a gray shingled roof.  The numbers "**2511**" appear in black affixed to the north face of the residence on the east side of the white front door.  The front of the residence has a porch with white wooden railing around it and steps leading from the sidewalk up to the front door.  There is a small set of stairs in the back of the residence that lead to an all white rear entry door.  The stairs have a white wooden railing and a small platform area leading up to the door.  The residence also has a detached garage with tan siding and a gray shingled roof.  The garage has a rollup door that is all white in color the opens from the south side of the garage.  There is also a white man door for the garage on the northwest corner. **TARGET LOCATION A-1** is depicted below in Figure 1. **TARGET LOCATION A-1** is used by WESLEY-Carter as a "stash" location where drugs are stored and distributed.  Case agents have observed WESLEY-Carter to frequent this location in the late afternoon through overnight hours and it is believed that Djuan WILLIAMS resides at this location. Search to include all areas of the residence including the detached garage, Antonio WESLEY-Carter's person, if he is present, Djuan WILLIAMS' person, if he is present, the three TARGET VEHICLES detailed below, if present, and any cellular devices or computers used by or associated with WESLEY-Carter or Djuan WILLIAMS.

4



**FIGURE 1**

b. **Attachment A-2:** 2743 N. 29th Street, Milwaukee, WI **(TARGET LOCATION A-2)** is a two story, single family, residence with white siding, blue trim, and gray shingled roof. The numbers "**2743**" appear in black affixed to the east face of the residence just south of the front door. The front door is located on the east side of the residence facing S. 29th Street and is all white in color. A small set of stairs with a blue wooden railing leads up to the front door and there is a chain link fence around the front yard area. There is another entry door on the southwest corner of the residence. The residence also has a detached garage with a red roof and white rollup door. The detached garage is located in the back of the residence to the west. Case agents believe that this residence is occupied by Scott WILLIAMS and is used by WESLEY-Carter and others to store and distribute controlled substances. **TARGET LOCATION A-2** is

5

depicted below in Figure 2. Search to include all areas of the residence including the detached garage, Antonio WESLEY-Carter's person, if he is present, Scott WILLIAMS' person, if he is present, the three **TARGET VEHICLES**, if present, and any cellular devices or computers used by or associated with WESLEY-Carter or Scott WILLIAMS.



**FIGURE 2**

c. **Attachment A-3:** 3858 N. 98th Street, Milwaukee, WI **(TARGET LOCATION A-3)** is a split-level, single family, residence with a tan brick front and brown or tan siding on the rear area and a black shingled roof. The number 3858 are affixed to the west face of the residence on the south side of the front door which is white in color. The front door has a glass storm door. There is a wooden privacy fence that extends out from the northwest corner of the residence and surrounds the backyard. The

6

residence has a detached garage with brown siding and a rollup door that faces north into the alley behind the residence. **TARGET LOCATION A-3** is depicted below in Figure 3. Case agents believe that this residence is occupied by Antonio WESLEY-Carter, Shamia WASHINGTON and two children under the age of 10 and is used by WESLEY-Carter and others to store and distribute controlled substances and proceeds from the distribution of controlled substances. WESLEY-Carter is the only member of the DTO that case agents have observed utilizing this residence and it is believed to be his primary residence. Search to include all areas of the residence including the detached garage, Antonio WESLEY-Carter's person, if he is present, vehicles associated with WESLEY-Carter (the three **TARGET VEHICLES** detailed below), if present, and any cellular devices or computers used by or associated with WESLEY-Carter. **TARGET LOCATION A-1, TARGET LOCATION A-2,** and **TARGET LOCATION A-3** are collectively referred to herein as the **TARGET LOCATIONS.**



**FIGURE 3**

7

d. **Attachment A-4**: 2025 Gray Volkswagen Atlas, Minnesota Plate SRJ495. VIN Number 1V2WR2CA9SC571812. **(TARGET VEHICLE 1). TARGET VEHICLE 1** is depicted below in Figure 4 and was most recently observed by case agents parked on the street in front of **TARGET LOCATION A-3** on March 24, 2026. **TARGET VEHICLE 1** is also often observed to be driven by Shamia WASHINGTON. WASHINGTON resides with WESLEY-Carter at **TARGET LOCATION A-3**. WASHINGTON is typically observed departing **TARGET LOCATION A-3** at approximately 7:30 a.m. most mornings with one or two small children under the age of 10. WASHINGTON is known to work at Signature Service Mortuary located at 4065 N. 35th Street, Milwaukee, WI. Case agents have observed vehicles associated with WESLEY-Carter parked on the property of Signature Service Mortuary as recently as February 26, 2026. Because I know from prior surveillance that WESLEY-Carter operates **TARGET VEHICLE 1**, but that WASHINGTON occasionally uses cars associated with WESLEY-CARTER to travel to and from the Mortuary, I am requesting authorization to enter onto the Mortuary property to search **TARGET VEHICLE 1** if **TARGET VEHICLE 1** is observed by case agents to be on said property.

8



**FIGURE 4**

e.  **Attachment A-5:** 2011 White Chevrolet Express Van, Minnesota Plate RRE754.  VIN Number 1GCWGFCA8V1149833 (**TARGET VEHICLE 2**).  **TARGET VEHICLE 2** is depicted below in Figure 5 and was most recently observed by case agents parked on the street in the rear of **TARGET LOCATION A-1** on March 24, 2026.  Case agents have observed Djuan WILLIAMS operating **TARGET VEHICLE 2.**



**FIGURE 5**

f.  **Attachment A-6:** 2024 Silver Hyundai Palisade, Wisconsin Plate AZS-2165, VIN Number KM8R5DGE2RU766623 (**TARGET VEHICLE 3**).

9

**TARGET VEHICLE 3** is depicted below in Figure 6 and was most recently observed by case agents parked on the street in front of **TARGET LOCATION A-1** on March 24, 2026. **TARGET VEHICLE 1, TARGET VEHICLE 2,** and **TARGET VEHICLE 3** are collectively referred to herein as the **"TARGET VEHICLES."**



**FIGURE 6**

## PROBABLE CAUSE

8.      In the fall of 2025, the Drug Enforcement Administration (DEA) Milwaukee District Office initiated an investigation into Antonio WESLEY-CARTER. Information was developed from a Confidential Source (CS) that identified WESLEY-CARTER as a kilogram quantity drug distributer in the Milwaukee, WI area. The CS relayed that WESLEY-CARTER utilized 414-336-1768 (Subject Cell Phone) to facilitate drug transactions. The CS relayed that the CS knew this from prior drug transactions that occurred between the CS and WESLEY-CARTER prior to the CS's cooperation wherein the CS contacted WESLEY-CARTER at the Subject Cell Phone to arrange to purchase controlled substances. The CS was shown a photograph of WESLEY-CARTER and the CS identified the person in the photograph as the person from whom the CS purchased controlled substances.

10

9. Beginning in October of 2025, the CS made statements against the CS's penal interest. The CS has the following criminal convictions: disorderly conduct, possession of THC and drug paraphernalia. The CS has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by the CS has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the CS's cooperation. The CS has provided information that has led to the seizure of controlled substances and the arrest of individuals. The CS also participated in at least two controlled buys as detailed below. Following the buys, the CS was debriefed by case agents and the CS's versions of events were later corroborated by case agents' review of covertly recorded audio of the controlled buy transactions (as well as video of the first controlled buy). The CS has charged and pending felony drug charges and is cooperating with law enforcement in hopes of receiving judicial and prosecutorial consideration. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe that the CS is credible and the CS's information is reliable.

10. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which a confidential source (CS) purchases controlled substances from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When a confidential source (CS) is used, the CS is searched for contraband, weapons, and money before the operation. The CS is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the CS meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The CS is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the CS while under the direction

11

and control of case agents are recorded. The purchased controlled substances are then weighed and field tested by case agents. To the extent that I refer to a controlled buy below, it was conducted in this manner unless otherwise noted.

**November 2025 Controlled Buy at TARGET LOCATION A-2**

11. On or about November 18, 2025, the CS, at the direction of case agents, called 414-336-1768 (hereinafter "Subject Cell Phone") in order to inquire about the purchase of cocaine. Following the phone call, the CS contacted case agents and relayed that the CS had spoken to WESLEY-CARTER and WESLEY-CARTER agreed to provide three ounces of cocaine to the CS for $2,100. Case agents verified that this call was placed to the Subject Cell Phone by reviewing the CS's telephone and confirming the number that was dialed, but it was not recorded or witnessed by case agents.

12. On or about November 19, 2025, at the direction of case agents, the CS placed another call to the Subject Cell Phone. Following the phone call, the CS relayed that the CS had talked to WESLEY-CARTER and WESLEY-CARTER was ready for the drug transaction. Case agents verified that this call was placed to the Subject Cell Phone by reviewing the CS's telephone and confirming the number that was dialed, but it was not recorded or witnessed by case agents.

13. An additional phone call was placed to the Subject Cell Phone by the CS leading up to the drug transaction to confirm that WESLEY-CARTER would be ready to sell the CS cocaine. This phone call was recorded and witnessed by case agents. Case agents verified that this call was placed to the Subject Cell Phone by reviewing the CS's telephone and confirming the number that was dialed.

14. Based on my training and experience, I believe that the Subject Cell Phone was being utilized by WESLEY-CARTER to coordinate drug transactions.

12

15. On November 19, 2025, in the afternoon, case agents met with the CS. The CS and CS's vehicle were searched for contraband and U.S. Currency with negative results. The CS was provided with $2,250 of pre-recorded U.S. Currency as well as audio and video recording equipment. At approximately the same time, case agents established surveillance in the area of 2743 N. 29th Street in Milwaukee, Wisconsin **(TARGET LOCATION A-2).** According to the CS, this address was previously utilized by the CS to meet with WESLEY-CARTER for drug transactions prior to the CS's cooperation with law enforcement.

16. Case agents maintained constant visual contact while the CS was enroute to **TARGET LOCATION A-2**. Case agents observed the CS's vehicle park in front of the **TARGET LOCATION A-2**. After a short time, case agents observed the CS exit the CS's vehicle and enter **TARGET LOCATION A-2**. After a short time, the CS exited **TARGET LOCATION A-2** and got into the CS's vehicle and departed. Case agents maintained constant visual contact with the CS's vehicle while enroute to a predetermined meeting location. Case agents met with the CS at the predetermined meeting location. Case agents retrieved the audio and video recording equipment. The CS turned over a clear plastic bag containing a white chunky substance (suspected cocaine) to case agents. The CS also turned over $150 of pre recorded U.S. Currency. Case agents searched the CS's vehicle and the CS for contraband with negative results.

17. The CS then provided a statement about what occurred within **TARGET LOCATION A-2**. The CS relayed that the CS had entered **TARGET LOCATION A-2** and met with an older black male. The older black male provided the suspected cocaine to the CS and the CS provided $2,100 of pre-recorded U.S. Currency to the older black male. The CS relayed that the CS inquired as to the price of pills. The CS relayed that the older black male called an individual who the CS believed to be WESLEY-CARTER. The older black man then told the CS that the

13

pills (ecstasy pills) were $70 a "jar" (a jar is 100 ecstasy pills). Initially, however, the older black male stated, "the blues" which I believe this to a be a reference to fentanyl pills. The CS clarified for the older black male that the CS was talking about ecstasy pills. The CS also relayed that the CS saw two plastic bags inside **TARGET LOCATION A-2** near a window sill containing what the CS believed was cocaine.

18.     The CS also relayed that upon getting into the CS's vehicle, the CS received a phone call from the Subject Cell Phone. This call was recorded. Case agents later confirmed this by viewing the call log of the CS's cell phone and observed an incoming call from the Subject Cell Phone at the approximate time that the CS was seen within the CS's vehicle. The CS relayed that the CS spoke to WESLEY-CARTER (via the Subject Cell Phone). WESLEY-CARTER clarified that the price for ecstasy pills was $650 for 1,000 pills. Based on my training and experience, I believe that this also confirms that the older black male in the residence contacted WESLEY-CARTER to inquire about the price of the pills requested by the CS. The CS also relayed that the older black male had provided drugs to the CS in the past on behalf of WESLEY-CARTER. This was prior to the CS's cooperation with law enforcement.

19.     Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the cocaine purchase and discussion regarding the pills. Case agents were able to see the older black male's face in the recording and subsequently identified him as Scott M. WILLIAMS. Case agents identified WILLIAMS as the older black male who provided the cocaine to the CS that the CS had ordered from WESLEY-CARTER.

14

20.     Case agents field tested the suspected cocaine and it tested positive for the presumptive presence of cocaine. Case agents weighed the cocaine and it weighed approximately 90.3 grams.

21.     On December 4, 2025, the Honorable William E. Duffin, Magistrate Judge in the Eastern District of Wisconsin, granted a court order for case agents to electronically monitor the location of the Subject Cell Phone.  On this same date, the court order was served to the service provider, Verizon Wireless.  Case agents began to receive pings for the Subject Cell Phone at approximately 3:56 p.m. on December 4, 2025.  This court order expired on January 3, 2026.

### December 2025 Controlled Buy at TARGET LOCATION A-2

22.     On or about December 11, 2025, case agents met with the CS.  The CS and CS's vehicle were searched for contraband and U.S. Currency with negative results. The CS was provided with $2,750 of pre-recorded U.S. Currency as well as audio and video recording equipment. At approximately the same time, case agents established surveillance in the area of **TARGET LOCATION A-2.**

23.     At the direction of case agents, CS placed a telephone call to the Subject Cell Phone, which was answered by WESLEY-CARTER.  Case agents witnessed, but did not record, this call between the CS and WESLEY-CARTER and confirmed that the call was placed to the Subject Cell Phone by observing the number dialed by the CS. During this call, the CS placed an order for 1,000 ecstasy pills and three ounces of cocaine.  WESLEY-CARTER directed the CS to come to the area of **TARGET LOCATION A-2**.

24.     Case agents maintained constant visual contact while the CS was enroute to **TARGET LOCATION A-2.**  CS made no stops and interacted with no one from the time the CS was searched by case agents until the time the CS arrived at **TARGET LOCATION A-2**. The CS

15

was ultimately observed parking the CS's vehicle in front of **TARGET LOCATION A-2**. A short time after the CS was observed arriving in the area, case agents observed a dark colored Toyota Highlander, Florida Plate DU1-1YT park in the alley directly behind **TARGET LOCATION A-2**. A black male (suspected to be WESLEY-CARTER but whose face was not observed by case agents) wearing dark colored clothing was observed exiting the Highlander and entering the door on the southwest corner of **TARGET LOCATION A-2**. After a short time, case agents observed the CS exit the CS's vehicle and walk towards the front door of **TARGET LOCATION A-2**. The CS was observed standing at the bottom of the stairs near the front door for a brief period of time. Moments after the CS was observed at the bottom of the stairs, case agents observed the door on the southwest corner of **TARGET LOCATION A-2** open. The CS was then observed walking around the side of the residence and entering that same southwest door. The CS remained inside **TARGET LOCATION A-2** for approximately 4 minutes prior to case agents observing the CS depart the same southwest door and return to the CS vehicle. The CS departed the area in the CS vehicle at this time.

25. Case agents maintained constant visual contact with the CS's vehicle while enroute to a predetermined meeting location after the buy. The CS made no stops and interacted with no one from the time the CS departed from **TARGET LOCATION A-2**until the time that the CS met with case agents at the predetermined meeting location. Once at the predetermined meeting location, case agents retrieved the audio and video recording equipment. The CS also turned over a clear plastic bag containing a white chunky substance (suspected cocaine) and 10 clear plastic baggies each containing assorted multicolored pills (suspected ecstasy) to case agents. The CS and the CS's vehicle were again searched for contraband with negative results. Case agents field tested the white chunky substance and it tested positive for the presumptive presence of cocaine and

weighed approximately 85 grams with including original packaging. Case agents field tested the ecstasy pills and they tested positive for the presumptive presence of MDMA and weighed approximately 430 grams with original packaging.

26.     The CS provided a statement to case agents as to what had occurred once inside **TARGET LOCATION A-2**. The CS positively identified WESLEY-CARTER as the individual the CS met with inside the residence. The CS stated that the CS provided WESLEY-CARTER with the pre-recorded buy money and stated that WESLEY-CARTER pulled the baggie of suspected cocaine out of WESLEY-CARTER's pocket and handed it to the CS. The CS said that the CS observed the baggies of multicolored pills out in the open laying on a table ready to go.

27.     Case agents later learned that the video equipment the CS had been equipped with during this purchase had failed. Audio had been captured, but video was not. Case agents' review of the audio was consistent with the statement provided by the CS about what had occurred while inside **TARGET LOCATION A-2**.

28.     Case agents later ran Florida license plate DU1-1YT through law enforcement databases and learned that this vehicle is registered to PV Holding Corp, which is a subsidiary of the Avis Budget Group. On December 16, 2025, case agents provided a subpoena to Avis Budget Group via email for the rental portfolio on Florida plate DU1-1YT. On this same date, a response was received from Avis Budget Group that showed the vehicle had been rented by Javon CARTER (DOB: XX/XX/1986). According to Avis Budget Group, the vehicle was due to be returned on January 2, 2025. Additionally, the subpoena return indicated that CARTER had initially rented a Kia Telluride SUV, Florida plate 31B-SHP on December 2, 2025. Based on the subpoena return, it appeared that CARTER had switched the Kia Telluride for the Toyota Highlander on December

9, 2025. Case agents had observed the Kia SUV, Florida Plate 31B-SHP on December 9, 2025, at approximately 11:25 a.m. parked in front of **TARGET LOCATION A-2**.

29. On January 13, 2026, the Honorable Nancy Joseph, Magistrate Judge in the Eastern District of Wisconsin, granted a court order for case agents to electronically monitor the location of the Subject Cell Phone. On this same date, the court order was served to the service provider, Verizon Wireless. Case agents began to receive pings for the Subject Cell Phone at approximately 5:15 p.m. on January 13, 2026. This court order expired on February 12, 2026.

**January 2026 Controlled Buy at TARGET LOCATION A-1 and Phone Location Data Related to TARGET LOCATION A-3**

30. On or about January 26, 2026, case agents directed the CS to place a call to WESLEY-CARTER and inquire about purchasing "blues" (fentanyl pills) and "rollers" (ecstasy pills). This call was not recorded as the CS conducted the call prior to meeting with case agents. Case agents would later view the call log of the CS's device and confirm that the call had happened and confirmed that the CS was calling WESLEY-CARTER on the Subject Cell Phone. According to the CS: During the call, WESLEY-CARTER informed the CS that WESLEY-CARTER did not have any "blues," but stated to the CS that WESLEY-CARTER currently had the "rollers." After the CS spoke with WESLEY-CARTER, the CS immediately called case agents and notified them of the conversation. The CS further stated that during this call, WESLEY-CARTER told the CS that WESLEY-CARTER would provide a new location for the CS to travel to for this purchase. During the time of the call between the CS and WESLEY-CARTER, case agents had been monitoring the GPS location being received on the Subject Cell Phone. Case agents observed that the Subject Cell Phone was currently in the area of 3858 N. 98th Street, Milwaukee, WI (**TARGET LOCATION A-3)** the residence of WESLEY-CARTER.

31.     On this same date, case agents then met with the CS at a predetermined location. During this meeting, the CS and CS's vehicle were searched for contraband and U.S. Currency with negative results. The CS was provided with $650 of pre-recorded U.S. Currency as well as audio and video recording equipment.  Case agents also placed a GPS monitoring device inside the CS vehicle to monitor the CS vehicle's location in real time.  At the direction of case agents, the CS departed the predetermined meeting location and was directly followed by case agents with a plan for the CS to travel towards **TARGET LOCATION A-2**.  Shortly after departing, the CS was directed by case agents to again call WESLEY-CARTER on the Subject Cell Phone with the purpose of obtaining a meeting location.  This call was recorded, and during the call, WESLEY-CARTER informed the CS that WESLEY-CARTER would be ready to meet in approximately 20 minutes.  The CS was not provided with a location at this time and continued traveling in the direction of **TARGET LOCATION A-2**.  Approximately 25 minutes after this call, the CS was again instructed to contact WESLEY-CARTER by calling the Subject Cell Phone.  WESLEY-CARTER informed the CS to travel to 2511 W. Auer Avenue, Milwaukee, WI, (**TARGET LOCATION A-1)**.  This address was also sent via text message to the CS by WESLEY-CARTER from the Subject Cell Phone (as verified by case agents after reviewing the CS's device). Case agents would later view this text message and download a copy of this message which was later placed into DEA evidence.

32.     In anticipation of the controlled buy, case agents were monitoring location data for the Subject Cell Phone on January 26, 2026, and noted that the Subject Cell Phone was not in the area of **TARGET LOCATION A-1**.  Therefore, case agents expected that the CS would again meet with an intermediary working with WESLEY-CARTER, as the CS did during the earlier buy on November 19, 2025.

33. Once the CS received the address information from WESLEY-CARTER, surveillance units were established in the area of **TARGET LOCATION A-1**. However, out of an abundance of caution related to the surveillance consciousness of WESLEY-CARTER, case agents could not position themselves in a manner to see the front door of **TARGET LOCATION A-1**. The CS was still being directly followed by case agents and was observed to turn eastbound on W. Auer Avenue from N. 27th Street. Case agents observed the GPS device placed in the CS vehicle show that the CS vehicle came to a stop directly in front of **TARGET LOCATION A-1**. The location data obtained from this GPS device would later be downloaded and placed into DEA evidence. Case agents monitoring the cover audio recording device could overhear the CS exiting the CS vehicle and a short time later the CS could be heard talking to another person with a male voice. After a brief conversation, the CS could then be heard entering the CS vehicle and shutting the door. Shortly after, the GPS location data showed the CS vehicle to depart eastbound on W. Auer Ave at which time case agents observed the CS's vehicle turn southbound from W. Auer Ave onto N. 25th Street.

34. The CS vehicle was directly followed from this area by case agents back to a predetermined meeting location. The CS made no stops and interacted with no one from the time the CS departed the area of **TARGET LOCATION A-1** until the CS was at the predetermined location. Once at this location, case agents retrieved the audio and video recording equipment and the GPS device from the CS vehicle. The CS also turned over two clear plastic bags filled with multi color pills which matched the appearance of the pills purchased on December 11, 2025. The CS and CS's vehicle were again searched for contraband with negative results. Case agents field tested the multicolored pills and received a presumptive positive test for the presence of MDMA. The pills weighed approximately 479 grams.

20

35. The CS provided a statement to case agents as to what had occurred during this purchase: The CS parked the CS vehicle directly in front of **TARGET LOCATION A-1** and then walked to the front door of the residence and walked inside. Once inside, a black male with a short haircut and goatee was standing inside already and the CS did not previously know this individual. This unknown black male was on a FaceTime phone call when the CS entered the residence. The black male showed the CS the phone and the CS observed that this unknown black male was on the phone with WESLEY-CARTER. The CS provided the unknown male with the $650 and the black male handed the CS two plastic bags filled with the multicolored pills.

36. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the pill purchase based upon what could be heard on the recording. However, the video did not capture the black male in the residence.

37. Through the investigation, case agents became aware that WESLEY- CARTER was associated with Djuan L. WILLIAMS (DOB: XX/XX/1979). Case agents showed the CS an unlabeled photo of Djuan WILLIAMS and the CS immediately identified Djuan WILLIAMS as the unknown black male that had been inside **TARGET LOCATION A-1** who was on the Facetime call with WESLEY-CARTER and who provided the CS with the pills.

38. On January 29, 2026, case agents received laboratory results from the pills that had been purchased on December 11, 2025. According to the DEA North Central Laboratory analysis, the pills were identified as Methamphetamine and had a net weight of 418.86 grams.

39. On February 12, 2026, the Honorable Nancy Joseph, Magistrate Judge in the Eastern District of Wisconsin, granted a court order extension for case agents to electronically monitor the location of the Subject Cell Phone. On this same date, the court order was served to

the service provider, Verizon Wireless. Case agents began to receive pings for the Subject Cell Phone at approximately 8:26 p.m. on February 12, 2026. This court order expired on March 11, 2026.

40. On February 12, 2026, case agents served two administrative subpoenas to Avis Budget regarding a gray Volkswagen Atlas with Minnesota Plate SRJ495 (**TARGET VEHICLE 1**). This vehicle according to a search of law enforcement databases is registered to PV Holding Corp, which is a subsidiary of the Avis Budget Group. The subpoenas requested the basic rental portfolio information as well as any video surveillance of the rental counter and the driver's license scan obtained by the rental company. On this same date, case agents received a response with the driver's license scan and a surveillance photo of the rental counter. The driver's license obtained was that of Ebony WESLEY-Carter and the surveillance photo showed Ebony WESLEY-Carter and Antonio WESLEY-Carter both standing at the rental counter. On February 20, 2026, a response was received from Avis Budget with the full rental portfolio information that indicates that **TARGET VEHICLE 1** had been rented by Ebony WESLEY-Carter and was due to be returned on March 3, 2026.

41. On February 17, 2026, at approximately 9:00 a.m., case agents observed a phone ping received on the Subject Cell Phone which placed the Subject Cell Phone in the area of the Brookfield Square shopping center located at 95 N. Moorland Rd, Brookfield, WI. Upon further review, case agents learned that the Subject Cell Phone had been pinging to this same general area since approximately 7:57 p.m. on February 16, 2026. On February 17, 2026, at approximately 11:26 a.m., case agents had telephonic contact with the CS. The CS stated that the CS had tried to reach WESLEY-Carter by calling the Subject Cell Phone but when the CS called the Subject Cell Phone it was answered by a staff member of the "Movie Tavern." I know that the "Movie Tavern"

is a business located within the Brookfield Square shopping center.  According to the CS, the staff member informed the CS that the device (which I believe to be the Subject Cell Phone) had been left inside the Movie Tavern by a customer the night prior.

42.     At approximately 1:25 p.m., on February 17, 2026, case agents monitoring remote video surveillance at **TARGET LOCATION A-3** observed that a subject exited the back fenced in area of the residence and departed the area in **TARGET VEHICLE 1**.  Upon observing **TARGET VEHICLE 1** depart the area, case agents decided to establish surveillance at the Movie Tavern.  As I arrived in the area of the Movie Tavern at approximately 1:46 p.m., I observed **TARGET VEHICLE 1** traveling westbound on Brookfield Square Drive and entering the parking lot for the Movie Tavern.  **TARGET VEHICLE 1** drove directly in front of me and I clearly observed Antonio WESLEY-Carter to be the driver and sole occupant of **TARGET VEHICLE 1**.  WESLEY-Carter parked **TARGET VEHICLE 1** on the street directly in front of the Movie Tavern and turned the hazard lights on for the vehicle and was then observed walking into the Movie Tavern.  WESLEY-Carter was only inside the business for a brief moment and was observed walking back to **TARGET VEHICLE 1** at approximately 1:48 p.m. at which time he entered **TARGET VEHICLE 1** and departed the area.  Surveillance on WESLEY-Carter was terminated at this time.  The CS later contacted case agents and stated that at approximately 1:49 p.m. on this same date the CS had received a phone call from WESLEY-Carter who was utilizing the Subject Cell Phone.  According to the CS, during this call, WESLEY-Carter informed the CS that WESLEY-Carter could get the CS legitimate Percocet pills for $40 per pill. I later reviewed ping data for Subject Cell Phone which showed that after I observed WESLEY-Carter at the Movie Tavern, the location data for the Subject Cell Phone no longer put the device in the area of that

23

business. From this, I believe it is clear that WESLEY-Carter took possession of the Subject Cell Phone from the Movie Tavern and departed with the device in **TARGET VEHICLE 1**.

**February 2026 Controlled Buy at TARGET LOCATION A-1**

43. On or about February 23, 2026, case agents met with the CS at a predetermined location in order to coordinate a buy from WESLEY-Carter of 2,000 methamphetamine pills. Upon meeting with the CS, the CS and the CS vehicle were searched for drugs, money, weapons, or other contraband with none located. The CS was then asked to place a call to WESLEY-Carter which the CS did in the presence of case agents. The CS called the Subject Cell Phone and WESLEY-Carter answered. This call was recorded, however, WESLEY-Carter's voice is not heard on the recording due to the CS phone not being placed on speakerphone so the CS is the only voice heard on the recording. However, the CS indicated that during this call WESLEY-Carter indicated that he was ready to sell the CS 2,000 methamphetamine pills, but WESLEY-Carter did not give the CS an exact time or location for the purchase during this call. Case agents reviewed the call log of the CS phone and verified that the CS had called the Subject Cell Phone. Once this call was made, case agents established surveillance units in the area of **TARGET LOCATION A-1**, anticipating that this would be the location where the purchase would take place. Case agents had also been monitoring the remote video surveillance established at **TARGET LOCATION A-1** and observed that the current rental vehicle known to be driven by WESLEY-Carter, **TARGET VEHICLE 1**, was parked directly behind **TARGET LOCATION A-1**. Case agents observed that WESLEY-Carter had exited **TARGET VEHICLE 1**when it parked and WESLEY-Carter walked into the rear door of the residence (**TARGET LOCATION A-1**). Immediately following the CS call to the Subject Cell Phone, WESLEY-Carter and an

24

unidentified black male exited the rear door of the Auer residence (**TARGET LOCATION A-1**) and departed the area in **TARGET VEHICLE 1**.

44. Prior to departing the predetermined location with the CS, the CS was equipped with covert audio and video recording devices and the CS was provided with $1,300 of prerecorded buy money. The CS was then directly followed to a second predetermined location awaiting a phone call back from WESLEY-Carter. The CS would then text and call the Subject Cell Phone and these went unanswered. At approximately 6:08 p.m., the CS received an incoming call from the Subject Cell Phone, and during this call, WESLEY-Carter told the CS that WESLEY-Carter was about to call the CS from another telephone number. This communication was recorded and reviewed and confirmed by case agents. At approximately 6:10 p.m., the CS then received a call from telephone number 414-243-3157 and the CS later stated to case agents that WESLEY-Carter was the caller using 414-243-3157. During this call, WESLEY-Carter told the CS to travel to the same location from the previous controlled purchase, **TARGET LOCATION A-1**. WESLEY-Carter also sent the CS a text message from telephone number 414-243-3157 with the address, **TARGET LOCATION A-1**. Case agents later acquired screenshots of the text message and call log from the CS phone and placed these screen shots into DEA evidence.

45. After receiving the address confirmation from WESLEY-Carter, the CS then left the second predetermined location en route to **TARGET LOCATION A-1**. The CS was once again directly followed by case agents and did not stop or meet with anyone along the way. The CS vehicle was observed parking in front of **TARGET LOCATION A-1**, however, due to the cover of darkness, the CS was not directly observed exiting the CS vehicle. Case agents monitoring the audio/video equipment the CS was equipped with could hear that the CS had exited the vehicle and could also hear the CS begin knocking on the door of **TARGET LOCATION A-**

25

1. Once the CS was inside **TARGET LOCATION A-1**, case agents could hear a male voice speaking with the CS and could also hear what sounded like a second male voice speaking to the CS on speakerphone. The CS was heard asking the male voice on speakerphone if they had any firearms for sale that the CS could purchase. The male voice was heard saying, "what you need, what you trying to spend? I got whatever you trying to get, big shit, little shit, I got whatever." Shortly after, the CS was heard leaving **TARGET LOCATION A-1**. After entering the CS vehicle, the CS was then directly followed to a predetermined location at which time the CS handed over a plastic grocery bag containing 20 small plastic baggies each containing approximately 100 multi-colored pills that resembled the pills purchased during the previous buys. At that time, case agents also collected the recording equipment the CS had been equipped with. The CS and CS vehicle were also searched by case agents at this time for additional drugs, money, weapons, or other contraband with none located. The CS was kept under constant surveillance from the time the CS re-entered the CS's vehicle after leaving **TARGET LOCATION A-1** until the time that the CS met with case agents. The CS made no stops and interacted with no one.

46. The CS stated that the same individual from the controlled purchase on January 26, 2026, had opened the door of **TARGET LOCATION A-1** when the CS arrived and this individual conducted the transaction with the CS for the pills. The CS had previously positively identified Djuan WILLIAMS by viewing a Wisconsin Issued Driver's License photo as the subject involved in the January 26th buy. The CS stated that the CS had provided the pre-recorded buy money to Djuan WILLIAMS that had been provided to the CS by case agents. The CS also stated that Djuan WILLIAMS was speaking with WESLEY-Carter on a FaceTime call when the CS was inside the residence. The CS stated that that the CS clearly observed WESLEY-Carter on this FaceTime call and it was WESLEY-Carter that discussed the purchase of a firearm with the CS. Case agents

26

then showed the CS the unlabeled Wisconsin Issued Driver's License photograph of Djuan WILLIAMS and the CS again confirmed this was the individual that had provided the 2,000 pills to the CS during this transaction.

47.     Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the pill purchase and firearms discussion based upon what could be heard on the recording. However, the video did not capture the face of either Djuan WILLIAMS or WESLEY-Carter (on the Facetime call).

48.     Case agents then transported the suspected methamphetamine pills back to Milwaukee DEA for processing.  The pills were subjected to a field test that yielded positive results for the presence of methamphetamine and the pills had a weight of approximately 906.6 grams.

49.     On or about March 1, 2026, the CS was contacted by case agents and asked to place a call to WESLEY-Carter to inquire about the purchase of a firearm the following day.  Case agents were not present with the CS at this time and this call was not recorded.  The CS later called case agents and stated that the CS had contacted WESLEY-Carter on the Subject Cell Phone and WESLEY-Carter confirmed that he would sell the CS a Glock handgun for $900 along with 2,000 pills. I later confirmed that this contact occurred via the Subject Cell Phone by reviewing the court ordered Pen Register Trap and Trace information being received on the Subject Cell Phone and confirming that that CS did in fact call the Subject Cell Phone.  The CS had also stated to case agents that the CS had made this contact by calling the Subject Cell Phone.

50.     On March 2, 2026, the CS contacted case agents and stated that they had received a text message from WESLEY-Carter on the Subject Cell phone that said, "what time you thinking family good morning."  The CS was directed to inform WESLEY-Carter that the CS would be

ready to make the purchase around 5:00 p.m. I later confirmed that this contact occurred via the Subject Cell Phone by again confirming with the CS that the CS did in fact call the Subject Cell Phone and by reviewing the court ordered Pen Register Trap and Trace on the Subject Cell Phone and confirming that the CS had been in contact with the Subject Cell Phone.

**March 2026 Controlled Drug and Firearm Purchase at TARGET LOCATION A-1**

51.     Later, on March 2, 2026, the CS met with case agents at a predetermined location. At that time, the CS and CS vehicle were searched for drugs, money, weapons, or other contraband with none located.  The CS was given $1,300 prerecorded DEA buy money for the pills and $900 of prerecorded ATF buy money for the firearm.  The CS was directed to place a recorded call to the Subject Cell Phone and let WESLEY-Carter know that the CS was ready for the buy.  This call was recorded and case agents observed that the call was made to the Subject Cell Phone.  During the call, WESLEY-Carter told the CS to "pull up" which the CS understood to mean that WESLEY-Carter was ready for the deal.  Prior to departing the predetermined location, case agents established surveillance units in the area of **TARGET LOCATION A-1**.  As surveillance was being established, the CS departed the predetermined meeting location and was directly followed by case agents to **TARGET LOCATION A-1**.  At no time was the CS out of view and the CS made no stops or interacted with anyone prior to arriving at **TARGET LOCATION A-1**.

52.     The CS vehicle was observed parking directly in front of **TARGET LOCATION A-1** and the CS remained in the CS vehicle.  Shortly after the CS was observed parking, case agents observed **TARGET VEHICLE 1** traveling northbound on N. 26th Street from Auer Ave.  Shortly after, **TARGET VEHICLE 1** was then observed traveling southbound on N. 25th Street towards Auer Ave, and the vehicle was ultimately observed to park directly behind **TARGET LOCATION A-1**.  Approximately five minutes after **TARGET VEHICLE 1**was observed

28

parking, case agents observed Djuan WILLIAMS exit the front door of **TARGET LOCATION A-1**. At that time, the CS was also observed exiting the CS vehicle and entering the front door of **TARGET LOCATION A-1.** A short time after the CS entered **TARGET LOCATION A-1**, case agents observed through remote video surveillance, a black male subject exit the rear door of **TARGET LOCATION A-1** and walk to **TARGET VEHICLE 1**. The black male opened the front passenger door for a moment, appeared to retrieve something, and then walk back inside **TARGET LOCATION A-1** using the rear door to the residence. Comparisons were later made by viewing the covert recording devices and case agents were able to positively identify Antonio WESLEY-Carter as the black male that had been observed parking **TARGET VEHICLE 1** and retrieving the object from **TARGET VEHICLE 1**. Based on my training and experience, I believe that WESLEY-CARTER accessed **TARGET VEHICLE 1** in the midst of conducting a drug transaction, which I believe demonstrates the association of **TARGET VEHICLE 1** with the Target Offenses.

53.     The CS ultimately was observed leaving through the front door of **TARGET LOCATION A-1**. Djuan WILLIAMS and WESLEY-Carter were observed leaving at approximately the same time as the CS. WILLIAMS entered a silver in color Hyundai Palisade, Wisconsin Plate AZS-2165 (**TARGET VEHICLE 3**) and WESLEY-Carter entered **TARGET VEHICLE 1** and they both departed the area. Visual contact of the CS was briefly lost due to all parties leaving the residence at the same time. Visual surveillance was reestablished with the CS vehicle approximately 3 blocks from the residence. As case agents traveled southbound on N. 27th Street, **TARGET VEHICLE 1** was observed traveling northbound on N. 27th and I clearly observed WESLEY-Carter to be the driver of the vehicle. I later reviewed the covert recording made by the CS of this buy and confirmed that during the brief time when the CS was out of view

of case agents after departing the residence, the CS did not make any stops or interact with any other people. **TARGET VEHICLE 3** is registered to a 2024 silver Hyundai Palisade to Brandon M. WILLIAMS at 4715 N. 41st Street, Milwaukee, WI and has a VIN number of KM8R5DGE2RU766623. Based on my training and experience, I believe that WILLIAMS entered into **TARGET VEHICLE 3** shortly after the above-described drug transaction and I believe that demonstrates the association of **TARGET VEHICLE 3** with the Target Offenses.

54. Case agents met with the CS at a predetermined location at which time the CS provided a black plastic bag that contained approximately 20 smaller clear plastic baggies each containing approximately 100 multicolored suspected methamphetamine pills. The CS was searched at this time and no additional contraband was located, however the CS stated that the CS had left the handgun inside the CS vehicle for case agents to retrieve. Case agents then located a Glock 45 9mm handgun with a loaded magazine and round in the chamber inside the CS vehicle. The CS vehicle was searched at this time for additional contraband with none located.

55. The CS relayed to case agents that as the CS parked the CS vehicle in front of **TARGET LOCATION A-1**, the CS waited in the CS vehicle until the CS saw a black male exit the front door and indicate to the CS to come inside. The CS stated that once inside **TARGET LOCATION A-1**, the CS observed "Tone" and the same black male from the previous two controlled purchases to be inside. Case agents have positively identified "Tone" as Antonio WESLEY-Carter and the second black male has been previously positively identified as Djuan WILLIAMS. The CS stated that "Tone" (who I believe to be WESLEY-Carter) handed the CS the plastic bag containing the pills once the CS was inside the residence. The CS stated that they then observed that "Tone" (who I believe to be WESLEY-Carter) to be in possession of approximately 1,000 more of the same pills and he then placed these extra pills inside a cabinet

near where he had been standing. The CS stated that that "Tone" (who I believe to be WESLEY-Carter) then exited the residence using the back door and was gone for a brief period of time. The CS stated that when that "Tone" (who I believe to be WESLEY-Carter) came back inside **TARGET LOCATION A-1**, he had the handgun in his possession and then handed it to the CS. The CS stated that the CS had provided that "Tone" (who I believe to be WESLEY-Carter) with all $2,200 of prerecorded buy money for both the pills and the firearm and then departed **TARGET LOCATION A-1**.

56. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the pill and firearm purchase based upon what could be heard on the recording. Case agents were able to observe on the recording that Antonio WESLEY-Carter and Djuan WILLIAMS were both inside the residence and the video matched the statements made by the CS.

57. Case agents then transported the handgun and suspected methamphetamine pills back to Milwaukee DEA for processing. The pills were subjected to a field test that yielded positive results for the presence of amphetamines and the pills had a weight of approximately 997.8 grams.

58. On March 3, 2026, the CS contacted case agents and stated that the CS had been in telephonic contact with WESLEY-Carter on the Subject Cell Phone just prior to contacting case agents. Case agents later confirmed that this contact occurred via the Subject Cell Phone by confirming with the CS that the CS had dialed the Subject Cell Phone as well as verifying by checking the Court Ordered Pen Register Trap and Trac where I verified that the CS had in fact contact the Subject Cell Phone. The CS relayed that WESLEY-Carter told the CS that the CS

needed to switch the CS's vehicle because WESLEY-Carter was concerned that the CS was being followed by law enforcement. The CS stated that WESLEY-Carter said that WESLEY-Carter had utilized other individuals to conduct counter surveillance and had observed what WESLEY-Carter believed to be law enforcement vehicles in the area just after the buy on the day prior. The CS then said that WESLEY-Carter also told the CS that this is the reason WESLEY-Carter changed vehicles often. I believe this comment is in reference to the frequency with which WESLEY-Carter changes AVIS rental vehicles. The CS then said that WESLEY-Carter told the CS during this call that WESLEY-Carter primarily utilizes FaceTime calls because WESLEY-Carter had heard that these calls cannot be intercepted by law enforcement.

### Recent Remote Surveillance of the TARGET LOCATIONS

59. On March 18, 2026, at approximately 5:50 p.m. Scott WILLIAMS was observed through remote video surveillance exiting the front door of **TARGET LOCATION A-2**. WILLIAMS walked down the front steps of **TARGET LOCATION A-2** where WILLIAMS was observed talking to an unknown black male. A few minutes after WILLIAMS exited the front door of **TARGET LOCATION A-2**, **TARGET VEHICLE 1** was observed arriving in the area and parking directly in front of **TARGET LOCATION A-2**. WESLEY-Carter was observed exiting the driver's seat of **TARGET VEHICLE 1** and walking towards WILLIAMS where the two appeared to be having a conversation. A few minutes after WESLEY-Carter arrived, WESLEY-Carter got back into the driver's seat of **TARGET VEHICLE 1** and departed the area. WILLIAMS was then observed walking north on N. 29th street away from **TARGET LOCATION A-2**.

60. On March 20, 2026, at approximately 1:56 p.m. a male subject matching the appearance of Djuan WILLIAMS was observed through remote video surveillance exiting the rear

door of **TARGET LOCATION A-1** and walking to the passenger side of a maroon in color Dodge pickup truck that had parked in the alley. The male subject briefly interacted with the occupant(s) of the pickup truck, then opened the driver's door of a white chevy van parked on the parking slab in the rear of the residence. Case agents have observed this white van consistently parked at this location. The van has Minesota Plate RRE754 and is registered to a 2011 white Chevrolet Express Van with a VIN number of 1GCWGFCA8V1149833 to a Kara ROTH with an address of 5229 Greenfield Ave, Mounds View, Minnesota (**TARGET VEHICLE 2).** ROTH is a known associate of Deon WILLIAMS the brother of Djuan WILLIAMS. After briefly opening the door of **TARGET VEHICLE 2** that was parked on the parking slab for **TARGET LOCATION A-1**, the subject then entered the detached garage being **TARGET LOCATION A-1**. The subject was observed exiting the detached garage and entering the rear door of **TARGET LOCATION A-1** for less than 30 seconds before exiting the rear door of **TARGET LOCATION A-1**, walking back to the red pickup truck and handing an unidentified object to someone inside of the pickup truck. Based on my training and experience, I believe this was consistent with a drug transaction wherein the male I believe to be Djuan WILLIAMS exited **TARGET LOCATION A-1**, interacted with drug customers in the pick up truck, then accessed **TARGET VEHICLE 2**, and then went into the garage before returning and serving the occupants of the pick up truck with controlled substances. Based on my training and experience, I believe that WILLIAMS accessed **TARGET VEHICLE 2** in the midst of conducting an apparent drug transaction, which I believe demonstrates the association of **TARGET VEHICLE 2** with the Target Offenses.

61.    On March 20, 2026, at approximately 10:25 p.m., a subject was observed through remote video surveillance leaving the back door of **TARGET LOCATION A-1** and entering the driver's seat of **TARGET VEHICLE 2** parked on the parking slab in the rear of the residence.

33

At approximately 2:19 a.m., on March 21, 2026, **TARGET VEHICLE 2** was observed pulling back onto the parking slab behind **TARGET LOCATION A-1**. An unknown subject was observed exiting the driver's seat of **TARGET VEHICLE 2** and immediately entering the side door to the detached garage located behind **TARGET LOCATION** A-1. The subject was inside the detached garage for approximately 30 seconds before exiting and then entering the rear door of **TARGET LOCATION A-1**. Due to the cover of darkness, a positive identification of the subject utilizing **TARGET VEHICLE 2** could not be made.

### March 21, 2026 Observation of WESLEY-CARTER in Possession of a Large Amount of Suspected Methamphetamine Pills

62. On March 21, 2026, the CS contacted case agents and stated that WESLEY-Carter had contacted the CS via FaceTime call at approximately 7:53 p.m. on the evening of March 20, 2026. During this FaceTime call, the CS stated that WESLEY-Carter showed the CS a roasting pan filled with multi-colored pills consistent with the pills the CS had purchased from WESLEY-Carter during the previous controlled purchases. The CS estimated to have seen over 10,000 pills contained in the pan, and further stated that it appeared WESLEY-Carter was currently in the processes of bagging the pills for distribution. The CS provided a screen shot of the CS's phone call log showing that the FaceTime call between the CS and WESLEY-Carter had in fact occurred on March 20, 2026, at 7:53 p.m. as the CS had initially stated. The call itself was not recorded or witnessed by case agents. Case agents then reviewed the remote video surveillance at **TARGET LOCATION A-1** and observed that **TARGET VEHICLE 1**, which I know to be often utilized by WESLEY-Carter based on prior surveillance, had arrived and parked in the alley at approximately 7:39 p.m. As **TARGET VEHICLE 1** parked, a subject matching the description of WESLEY-Carter was observed exiting the vehicle and entering the residence (**TARGET LOCATION A-1**) through the back door carrying a bag in his left hand. Additionally, a ping

received at 7:51 p.m. on this same date placed the Subject Cell Phone in the area of **TARGET LOCATION A-1**.

### Vehicles, Basements and Outbuildings

63. I know based upon my training and experience that controlled substances and evidence of narcotics trafficking can be secreted in any part of a residence including garages, storage areas related to the premises, vehicles on and associated with the premises, and on persons engaged in drug trafficking within the residence; that through personal training and experience in investigating drug trafficking, affiant knows controlled substances are frequently stored with drug proceeds and other drug paraphernalia at drug traffickers residences; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons residing in or having control of the premise; and that these items can be stored in various locations accessible to the target residence including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged in drug trafficking would conceal evidence related to drug trafficking in multiple areas associated with their residence including vehicles, garages and basements.

### Computers, Electronic Storage and Forensic Analysis

64. As described above and in Attachments B1-B6, this application seeks permission to search for records that might be found at the **TARGET LOCATIONS,** in the **TARGET VEHICLES,** and/or on the persons of WESLEY-CARTER, D. WILLIAMS, and S. WILLIAMS, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for

35

would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

65. I submit that if a computer, cellular telephone, or storage medium is found at the **TARGET LOCATIONS**, in the **TARGET VEHICLES**, and/or on the persons of WESLEY-CARTER, D. WILLIAMS, and S. WILLIAMS, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

66. *Forensic evidence*. As further described in Attachments B1-B4, this application seeks permission to locate not only computer files that might serve as direct

evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET LOCATIONS,** in the **TARGET VEHICLES,** and/or on the persons of WESLEY-CARTER, D. WILLIAMS, and S. WILLIAMS because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of

37

computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of

the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

67. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the

39

storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

68. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

69. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up

40

to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

70. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

71. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data

contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

72.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

73.     *Unlocking Apple brand devices:* I know based on my training and experience, as well as from information found in publicly available materials including those published by Apple, that Apple devices are used by many people in the United States, and that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") or facial recognition in lieu of a numeric or alphanumeric passcode or password. These features are called Touch ID and Face ID, respectively. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.

42

In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made. If Touch ID enabled Apple devices are found during a search of the **TARGET LOCATIONS** and/or within the **TARGET VEHICLES** and/or on the persons of WESLEY-CARTER, S. WILLIAMS, and/or D. WILLIAMS, the passcode or password that would unlock such the devices are presently unknown to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of any Apple device(s) found during the search of the **TARGET LOCATIONS** and/or within the **TARGET VEHICLES** and/or on the persons of WESLEY-CARTER, S. WILLIAMS, and/or D. WILLIAMS to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of

43

executing the search authorized by this warrant. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the premises to press their finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of the **TARGET LOCATIONS** and/or within the **TARGET VEHICLES** and/or on the persons of WESLEY-CARTER, S. WILLIAMS, and/or D. WILLIAMS in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID. Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Apple device(s) found in the **TARGET LOCATIONS** and/or within the **TARGET VEHICLES** and/or on the persons of WESLEY-CARTER, S. WILLIAMS, and/or D. WILLIAMS, as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of WESLEY-CARTER, S. WILLIAMS, and/or D. WILLIAMS to the Touch ID sensor of the Apple brand device(s), such as an iPhone or

44

iPad, found at the **TARGET LOCATIONS** and/or within the **TARGET VEHICLES** and/or on the persons of WESLEY-CARTER, S. WILLIAMS, and/or D. WILLIAMS for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

74.    Due to the foregoing, with respect to WESLEY-CARTER, D. WILLIAMS, and S. WILLIAMS, if reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person (WESLEY-CARTER, D. WILLIAMS, and/or S. WILLIAMS) to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's (WESLEY-CARTER, D. WILLIAMS, and/or S. WILLIAMS) face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

75.    Because several people may share the **TARGET LOCATIONS** as a residence, it is possible that the **TARGET LOCATIONS** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**CONCLUSION**

76.    Based on the foregoing, I believe there is probable cause to believe that WESLEY-CARTER, D. WILLIAMS, and S. WILLIAMS, are committing violations of

federal law, including the Target Offenses and that evidence of said offenses will be located on their persons.

77.     Based on the forgoing, I believe there is probable cause to believe Antonio WESLEY-Carter (DOB:XX/XX/1985), Scott M. WILLIAMS (DOB:XX/XX/1959), Djuan L. WILLIAMS (DOB: XX/XX/1979), and other known and unknown individuals have and are committing violations of Title 21 United States Code Sections 841(a)(1), 843 and 846. I further believe that there is probable to believe that located at and in the **TARGET LOCATIONS**, within the **TARGET VEHICLES,** and on Antonio WESLEY-Carter, Scott M. WILLIAMS, and Djuan L. WILLIAMS, further described in Attachments A-1 to A-6, there is evidence of these crimes, all of which is detailed more specifically in Attachments B-1 to B-6, that a warrant issue authorizing the search of the same.

<u>**ATTACHMENT A-3**</u>
<u>**PLACE TO BE SEARCHED**</u>

3858 N. 98th Street, Milwaukee, WI **(TARGET LOCATION A-3)** is a split-level, single family, residence with a tan brick front and brown or tan siding on the rear area and a black shingled roof. The number 3858 are affixed to the west face of the residence on the south side of the front door which is white in color. The front door has a glass storm door. There is a wooden privacy fence that extends out from the northwest corner of the residence and surrounds the backyard. The residence has a detached garage with brown siding and a rollup door that faces north into the alley behind the residence. **TARGET LOCATION A-3** is depicted below in Figure 1. This warrant authorizes law enforcement to search all areas of the residence including the detached garage, Antonio WESLEY-Carter's person, if he is present, the three "TARGET VEHICLES" identified in the attached affidavit, if present, and any cellular devices or computers used by or associated with WESLEY-Carter



<u>**Figure 1**</u>

# ATTACHMENT B-3

## ITEMS TO BE SEIZED

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, committed by of Antonio WESLEY-CARTER, Djuan WILLIAMS, and/or Scott WILLIAMS, and other known and unknown individuals, between October 1, 2025, to present including:

a. Controlled substances;

b. Evidence of the crimes described above;

c. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

d. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

e. Preparatory steps taken in furtherance of that crime;

f. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

g. Evidence of motive, intent, or knowledge of the crimes described above;

h. Evidence of the location, whereabouts, and patterns of travel of Antonio WESLEY-Carter, Djuan WILLIAMS, and Scott WILLIAMS;

i. Evidence about the appearance, clothing, and identity of Antonio WESLEY-Carter, Djuan WILLIAMS and Scott WILLIAMS;

j. All bank records, checks, credit card bills, account information, and other financial records;

k. Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

l. Lists of drug customers and related identifying information;

m. Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

n. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

o. Indicia of residency;

p. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

q. U.S. Currency;

r. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

s. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachment A-1, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of Antonio WESLEY-CARTER, Djuan WILLIAMS, and/or Scott WILLIAMS to the fingerprint sensor ("Touch ID") and (2) to present the face of Antonio WESLEY-CARTER, Djuan WILLIAMS, and/or Scott WILLIAMS to the facial recognition sensor, such as a camera, ("Face ID") of the device found at **TARGET LOCATION A-3** for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.